IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | | |
|---|---|---|
| TONY A. GUNTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 4:16-cv-0037 |
| v. | ) | |
| | ) | Judge McDonough |
| BEMIS COMPANY, INC., | ) | Magistrate Judge Steger |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Bemis brings its motion ignoring relevant testimony of Mr. Gunter's co-workers and supervisors who testified that he was performing his job duties without any problems. Bemis ignored the testimony of Bemis HR that Mr. Gunter was performing the "essential functions" of his job before they placed him out of work. Bemis based its discriminatory decision on the results of a Functional Capacity Evaluation ("FCE") that Mr. Gunter was forced to take as a result of a worker's compensation claim he filed when it unceremoniously terminated his 25-year employment. Indeed, only by relying on alternative facts selectively taken out of context as to Mr. Gunter's ability to perform his job did Bemis bring the instant motion.

After successfully performing his job for over eight months after surgery for a worker's compensation injury, Bemis forced Mr. Gunter to undergo a FCE so they could close out his worker's compensation claim. Immediately upon receiving the FCE, Bemis drew the discriminatory conclusion he now had "permanent restrictions," and that he was unable to perform his job, the same job he had been working for approximately eight months. Tellingly, nowhere in the report is the conclusion made that Mr. Gunter had "permanent restrictions" or that he should be removed from his job. Further, none of Mr. Gunter's physicians requested that

he have a restriction in place other than an overhead restriction that he had successfully worked under for months. Bemis's reliance on the so called "permanent restrictions" is simply direct evidence or pretext of disability discrimination. Bemis made the determination not to accommodate him and ultimately terminated him without (1) the benefit of observing Mr. Gunter performing his job duties and, (2) without asking his supervisors about his job performance. Had Bemis inquired or observed, they would have found that Mr. Gunter had no complaints, that he was able to successfully perform his job, and that his co-workers and supervisors had no problems with Mr. Gunter's job performance. In fact, Mr. Gunter was known as an honest, hard worker. Bemis's HR Manager, Kathy Young admitted Mr. Gunter was able to perform the "essential functions" of his job when he returned to his regular job duties after surgery. However, as a direct result of the FCE, and, despite Mr. Gunter's actual job performance, he was placed out of work.

Over two weeks after the FCE results, Mr. Gunter met with Ms. Young and EHS Manager, Wayne Eaton, for a "good faith meeting" to determine whether Mr. Gunter could be accommodated. Mr. Gunter, not understanding why he was placed out of work when he had been performing his job successfully for months' post-surgery was naturally confused. Then, when Mr. Gunter was asked how they could "accommodate him" and, having no understanding as to what this term of art meant, and not having been provided an explanation, he understood them to ask whether the press could be reconfigured and agreed it could not.[1] Bemis erroneously concluded that this was an "admission" that no accommodations could be made. To the contrary, Mr. Gunter suggested other positions, to be put back in his job and re-evaluated, but he was immediately shot down and kept out of work until his termination was finalized.

---

[1] Mr. Gunter has a limited education and has difficulty reading, and he had received no training under the ADA.

Bemis seeks to have Plaintiff's claims for violations of the FMLA, ADA, TDA and common law claims for retaliatory discharge dismissed.[2] Fact finding is for the jury. Disregarding all evidence favorable to Bemis that the jury is not required to believe given the countervailing evidence submitted by Mr. Gunter, Defendant's Motion for Summary Judgment (ECF No. 36) ("MSJ") and its accompanying Memorandum (ECF No. 37) ("Memo") fail to meet its burden that no reasonable jury could find in favor of Mr. Gunter based on the genuine issues of material fact that exist. Accordingly, Bemis's Motion should be denied.

## I.    FACTUAL BACKGROUND

### A.    Mr. Gunter's Employment at Bemis

Mr. Gunter was hired at Bemis' predecessor in 1989 as a laminator operator. (Gunter Dep. JA 7). Mr. Gunter worked his way up to press helper ("PH"), then press assistant ("PA") and he was regularly called to perform the job duties of press operator ("PO"). (*Id.* JA 9; Jennings Dep. JA Add. 267). During the 2013 to 2014 time frame, Mr. Gunter's supervisors were Clarence Jennings and Dave Moulder.[3] (Jennings Dep. JA Add. 266; Moulder Dep. JA Add. 275). Mr. Gunter was perceived by management to be a good worker. (Burns Dep. JA 76; Eaton Dep. JA Add. 277; Young Dep. JA Add. 280; Moulder Dep. JA Add. 275; Jennings Dep. JA Add. 266-267, 273). Mr. Gunter's managers also found him to be an honest employee. (Moulder Dep. JA Add. 275; Jennings Dep. JA Add. 271).

### B.    Mr. Gunter's Job Duties

Mr. Gunter's job as a PA is not a desk job, it is physical. (Gunter Dep. JA 4). However, most the work is performed with the use of equipment like hoists, tow motors, carts and platform

---

[2] Mr. Gunter is voluntarily dismissing the FMLA claims and TDA retaliation claims. Thus, the only claims at issue are the ADA (discrimination and retaliation), TDA (discrimination) and common law retaliation claims.
[3] Mr. Jennings was a 38 year employee at Bemis and Mr. Moulder was a 25 year employee (Jennings Dep. JA Add. 261; Moulder Dep. JA Add. 275).

ladders, facts which Bemis ignored in its brief.[4] (Gunter Dep. JA 3- 4; Moulder Dep. JA 80-82; Jennings Dep. JA Add. 262-266, 268). Mr. Gunter's supervisors Clarence Jennings and David Moulder, stated that each press is operated by a team of two to three employees, a PH, PA and PO, at all times. (Jennings Dep. JA Add. 270; Moulder Dep. JA 79, 80; see Gunter Dep. JA 8). Each employee is to help out the other at all times and supervisors assist when needed. (Jennings Dep. JA Add. 270; Moulder Dep. JA 80; Bills Dep. JA 103, JA Add. 283). Employees operating the presses range from women as small as five-foot tall to as tall as Mr. Gunter, who is over six feet tall. (Jennings Dep. JA Add. 272; Bills Dep. JA Add. 284).

The front of the press is referred to as the "rewind" where the finished good is taken off to get it out the door. (Jennings Dep. JA Add. 264). The back of the press is referred to as the "unwind" where the press is loaded with raw material and the ink is adjusted. (*Id*.). Typically if a PH is assigned, they are working the back of the press. (*Id*. 263). The PA is typically assigned the front of the press shadowing the operator. (*Id*.). If working the back of the press (unwind), the employee is loading and unloading rolls with hoists and attending to the inks and solvents. (*Id*. 262-265). If working the front of the press (rewind), the employee is helping take off rolls with the hoists, putting on labels, and checking for quality. (*Id*.).

At the time of Mr. Gunter's employment, there were four presses that had gears, the 861, 863, 864, and 865. (Bills Dep. JA 101). "Robots" put cylinders on that needed replacement. (*Id*.). They also had gearless presses: the 1071, 1072 and 1073. (*Id*. 104). Mr. Gunter could work all of the presses. (Jennings Dep. JA Add. 267)

Mr. Gunter had a written job description which sets forth "occasional" functional requirements based on "reasonable approximations." (PA Job Description JA 61-63). The job

---

[4] Bemis implied in its brief that cleaning the presses involved excessive reaching. (ECF 37 p. 6). However, Moulder testified that the use of platform ladders of varying heights enabled the employee to get to where they needed to be. (Moulder Dep. JA 80, 82).

description only lists standing, walking as "regularly required" tasks. (*Id.* JA 62). The "reasonable approximations" for the "occasional" tasks of carrying, lifting, pushing or pulling are estimated to take 20% of time on the task, and reaching 50% of time. (*Id.*). The job description did state that "reasonable accommodations may be made to enable an individual with disabilities to perform the essential functions, unless doing so would result in undo [sic] hardship." (*Id.*). However, the testimony, primarily that of Supervisor Jennings (which was completely ignored by Bemis)[5], disputes the written job description as follows:

| Job Function | Testimony | Citation |
|---|---|---|
| Carrying | Only "little five gallon bucket" of ink or solvent that is "no big heavy amount" or approximately 20 pounds. It is placed on a cart and moved to the press. Nothing is carried that is the weight limit listed on the job description. | Jennings Dep. JA Add. 264, 268-269. |
| | Mr. Jennings observed that Tony Gunter could perform carrying functions. | Jennings Dep. JA Add. 269. |
| | Mr. Gunter was able to pour ink with one arm. He had learned to tilt the bucket with his right hand and lift and pour with his left. | Gunter Dep. JA 23, JA Add. 294. |
| | They have "little gear parts" that employees may have to carry that weigh about 15 to 20 pounds. | Jennings Dep. JA Add. 272. |
| Lifting | Have weight limits of 45 pounds, but they have lifting equipment. Anything 46 to 80 pounds requires two people. They tell employees not to lift over 40 pounds. They stress using the lifting equipment for things under 45 pounds, so really employees don't have up pick up anything. | Jennings Dep. JA Add. 262, 269. |
| | Lifting is not done by hand; cylinders | Gunter Dep. JA Add. 294; |

<hr>

[5] Bemis did not cite to any testimony from Supervisor Jennings in its brief and, in fact, did not include any of his deposition transcript in the Joint Appendix despite having communicated to Plaintiff's counsel that it would do so. Mr. Gunter has filed Mr. Jennings' transcript in the Addendum because it contains facts and evidence that present disputed issues of material fact that support Mr. Gunter's position.

| | | |
|---|---|---|
| | and rolls are put in place by use of hoists. | Jennings Dep. JA Add. 264-265. |
| | It was "almost a requirement" that employees help each other if there was any heavy lifting. | Bills Dep. JA 104. *See* Moulder Dep. JA 79-80. |
| | On the back (of the press) there is no lifting because they have robots do that; on that front they put up tear sheets, but Tony could do that because it was only 4 to 5 feet high and was easier the taller you were. | Jennings Dep. JA Add. 265. |
| | Should not lift waist to shoulder, that is when lifting equipment is used. Only lifting from floor to waist is lifting ink or solvent to put on cart or pour in. | Jennings Dep. JA Add. 271. |
| Climbing | Very little, walk up stairs on the ladders, do not do often unless malfunction or web break. | Jennings Dep. JA Add. 266. |
| Pushing/Pulling | Not a lot of pushing, really "just guiding" the hoists in position. Pushing is not physically demanding [Mr. Jennings] can "bring his little niece to do it." No pulling, have an electric jack to do it. | Jennings Dep. JA Add. 269-270; Gunter Dep JA Add 294. |
| Reaching | Can reach up with one hand. | Bills Dep. JA Add. 284. |
| | Not too much reaching, might have to thread machine through the rollers, but Tony Gunter could do that. | Jennings Dep. JA Add. 270. |
| | There was not a lot of overhead work. | Young Dep. JA 36. |

Further, contrary to Bemis' assertion that Mr. Gunter admitted that lifting 45 pounds was an essential element of his job, in fact, Mr. Gunter agreed that a sleeve may be around 45 pounds, but that hoists lifted everything and Mr. Jennings' testimony backs this up. (ECF No. 37 p. 6; Gunter Dep. JA 4, 8, JA Add. 294. *See* Jennings Dep. JA Add. 262-266, 271).

## C.     Mr. Gunter's Workplace Accident and ADA Disability

6

Mr. Gunter injured his shoulder in January 2013 in a workplace accident. (Gunter Dep. JA 5). On the day of the injury, he was asked to go over to the 1071 machine to help with a sleeve that had gotten stuck. (*Id.* 5). He helped his co-worker David pull two sleeves off, but then the third sleeve stuck and when he was rocking the sleeve to get it unstuck, the heavy sleeve fell with his hand in the sleeve. (*Id.*). When the sleeve fell with his hand in it, his right shoulder "popped" and was injured. (*Id.*). Mr. Gunter continued to work injured because his supervisor, David Moulder, "dropped the ball" in filing an injury report. (Moulder Dep. JA Add. 275; Gunter Dep. JA 6).

After Mr. Gunter was finally assigned a worker's compensation case, he was sent to Dr. Lee and did physical therapy until June 2013. (Gunter Dep. JA 6). Mr. Gunter kept working during this time, but his shoulder started to freeze up. (*Id.* 6-7). After physical therapy proved ineffective, Mr. Gunter requested another doctor and he started seeing Dr. Garside in July 2013. (*Id.*). Dr. Garside immediately recommended surgery and Mr. Gunter underwent surgery on August 28, 2013. (*Id.*). Due to the lapse in time between his surgery and his injury, Mr. Gunter experienced nerve and muscle damage and his range of motion was impacted such that he can't get his arm over his head. (*Id.* 6-7). Mr. Gunter's range of motion has been limited like this since the injury. (*Id.*).

Wanting to get back to work, Mr. Gunter returned from surgery on or around September 17, 2013. (Young Dep. JA 73-74, 10/30/14 email, Young Dep. Ex. 8 JA Add. 296; Gunter Dep. JA 12). After returning, he was put on light duty/temporary assignment for approximately three months. (Young Dep. JA 35; Gunter Dep. JA 12). Mr. Gunter was released to his job as press assistant, but was regularly required to do PH job duties. (Gunter Dep. JA 12, JA Add. 293; *see* Young Dep. Ex. 8 JA Add. 296). When Mr. Gunter was released to his PA position with only the

restriction of no overhead work with his right arm, he was put back in the overtime rotation.[6] (Young Dep. JA 71; Bemis Policy Ex. 6 JA Add. 363-364). Being put in the overtime rotation is significant because employees that are on temporary alternate duty are not permitted to work overtime, only those are released back to their permanent positions can do so. (*Id*.). Indeed, Ms. Young admitted: "Up until the time he actually got the no overhead work and **he could perform the essential functions of his job**, then he was put on overtime. But there was a period in there that he wasn't in the overtime rotation."[7] (Young Dep. JA Add. 281). Thus, Ms. Young admitted Mr. Gunter was deemed by Bemis to be able to perform the essential functions of his job, or he would not have been allowed back to his regular position and required to take overtime. (*Id*.).

After Mr. Gunter was put back to his full duties as a PA, he just learned to work around his shoulder limitations. (Gunter Dep. JA 8). Supervisor Moulder, who lost three fingers in a workplace accident, also did the same, he just learned "work arounds" to get the job done. (Moulder Dep. JA 79). After Mr. Gunter returned to his PA position, Mr. Moulder agreed Mr. Gunter could do his job and that he was capable to work around his physical issues. (*Id*.). Both Mr. Moulder and Mr. Jennings had no problems with Mr. Gunter's job performance after his return, nor did they receive any complaints from his co-workers about his job performance. (Moulder Dep. JA 79, 82, JA Add. 275; Jennings Dep. JA Add. 266-268. *See* Bills Dep. JA 104; Young Dep. JA 36, 40, 41, JA Add. 281; Burns Dep. JA 75, 76; Eaton Dep. JA 69-70). Mr. Bills testified that it was not unusual to help each other out and that he helped Mr. Gunter if he needed any assistance. (Bills Dep. JA 104).

---

[6] Initially, Mr. Gunter's physician did not want him to work overtime so his shoulder could have more healing time between shifts, but Bemis would not allow him to return unless he was able to work overtime. (Gunter Dep. JA Add. 288-289). Because of this, Mr. Gunter's physician dropped the overtime restriction and Mr. Gunter paid a co-worker to take his overtime. (*Id*. at 289)

[7] Bemis completely ignored this admission in its Brief.

After Mr. Gunter injured his shoulder, Ms. Young encouraged him to drop his worker's compensation claim or there would be a good chance he would lose his job if he got a disability rating. (Gunter Dep. JA 24, JA Add. 286). After Mr. Gunter returned to work, he was no longer scheduled as a PO, but rather primarily a PA which resulted in $2.00 per hour less pay. (Gunter Dep. JA Add. 287). Moreover, Mr. Gunter was typically assigned PH job duties. (Gunter Dep. JA 14).

**D.    Mr. Gunter is Discriminated Against Because of His Disability**

Ms. Young had a discussion with Bemis' worker's compensation provider and the subject of Mr. Gunter's claim came up. (Young Dep. JA 36). As a result, the provider requested the FCE to see where they were for purposes of the worker's comp claim. (*Id*. 36-37). The FCE was not requested for compliance with the ADA. (*Id*. 37).

Mr. Gunter was told to get the FCE so they could give him a rating for the worker's comp case. (Gunter Dep. JA 21). On May 22, 2014, Mr. Gunter met an evaluator, Rob Pearce, in "an RV" in the Wal-Mart parking lot for the FCE. (*Id*; FCE JA 180). During the test, the evaluator would not let Mr. Gunter use his left hand even though he repeatedly asked the evaluator to do so. (Gunter Dep. JA 21). After the FCE, Mr. Gunter continued working as usual and continued to be successful in his job performance. (Young Dep. JA 37, 40). The evaluator did not come to the plant to observe Mr. Gunter performing his job duties. (*Id*. 41).

The evaluator issued the FCE on June 27, 2014. (Young Dep. JA 38). The FCE does not state Mr. Gunter had "permanent restrictions," nor does it indicate that he was not performing his job successfully. (FCE JA 180). The FCE was based only on the tests the evaluator had Mr.

Bemis perform in the RV in contrast with the approximations set forth in the PO written job description. (*Id.*; Young Dep. JA 41[8]).

Bemis received the results of the FCE on July 2, 2014, and, because of this piece of paper, Mr. Gunter was immediately placed out of work based on the perception he could no longer perform his job. (Young Dep. JA 38; Young Dep. Ex. 2 JA Add. 302). Because of the FCE, Bemis now viewed him as having "permanent restrictions" and used this distinction as an excuse to relieve him of his duties. (Young Dep, JA 40, 42; Burns Dep. JA 74-75). When Mr. Gunter was placed out of work, he was performing his job successfully; no member of the management team who made the decision to place him out of work observed him performing his job duties, nor were Mr. Gunter's supervisors involved in the decision or asked about his job performance. (Young Dep. JA 40-41, 51; Eaton Dep. JA 68-71; Moulder Dep. JA 79, 82; Burns Dep. JA 74-75; Jennings Dep. JA Add. 267-268). The decision that Bemis could not accommodate Mr. Gunter was made after the received the FCE, but Ms. Young could not recall whether it was before or after they met with Mr. Gunter. (Young Dep. JA 38).

**E.      Bemis Refuses to Accommodate Mr. Gunter**

Bemis scheduled a meeting with Mr. Gunter on July 18, 2014. (Young Dep. JA 37). Mr. Gunter met with Kathy Young and Wayne Eaton. (*Id.*). During this meeting, Bemis' ADA policy was not explained to Mr. Gunter despite the fact that this meeting was allegedly a "good faith" meeting "under the ADA."[9]  (Young Dep. JA 50; Gunter Dep. JA 26, JA Add. 290). Prior to the meeting, Ms. Young had already determined there

---

[8] The FCE was based on the job description of Press Operator, not Press Assistant. (FCE JA 180). However, all jobs descriptions, even those updated after Mr. Gunter's termination, appear to be substantially the same. (Young Dep. JA 41. *See* PA, PO and PH job descriptions JA 58-64).
[9] Bemis did not have an "ADA policy" per se rather, the only policy identified to the EEOC was marked as Ex. 6 to Ms. Young's deposition. (Young Dep. Ex. 6 JA Add. 363).

were no other positons for Mr. Gunter. (Eaton Dep. JA 68). Ms. Young and Mr. Eaton did not go through Mr. Gunter's job description with him and nothing was discussed about the job's essential functions. (Eaton Dep. JA 71; Gunter Dep. JA 10). During the meeting, Mr. Gunter was asked by Mr. Eaton how they could accommodate him on the back of the press. (Gunter Dep. JA 23; Young Dep. JA 37). Mr. Gunter had no understanding what this term of art meant under the ADA, and Mr. Eaton did not explain to him what he was asking. (Gunter Dep. JA 23). Mr. Gunter was under the impression that they were asking whether the press could be reconfigured. (Gunter Dep. JA 23, JA Add. 295). Mr. Gunter told Eaton that "you can't change the back of press, you know, from my arm going up" but that "[he] learned to work around it…because [he] tilt[s] the bucket with his right hand and hold[s] it with [his] left." (*Id*.). It was not explained to Mr. Gunter during this meeting what a reasonable accommodation was. (Gunter Dep. JA 23. *See* Eaton Dep. JA 70). Mr. Gunter asked to be re-evaluated in a year, stay in his job working the back of the press, or be assigned to different job if they thought he was unable to perform his job. (Gunter Dep. JA 23-26, 28, 30, JA Add. 292). These requests were refused. (*See* 11/3/14 Termination letter JA 216).

Mr. Eaton was not involved in the decision to place Mr. Gunter out of work.[10] (Eaton Dep. JA Add. 277). Mr. Eaton only helped with the "good faith" process, which did not involve observation, only looking at the job description and FCE. (Eaton Dep. JA. Add. 277). No one talked to Mr. Gunter's supervisors about whether he could perform his job or could be accommodated. (Moulder Dep. JA 82; Jennings Dep. JA Add. 267-268). Mr. Burns, interim plant manager, did not talk to Mr. Gunter or observe him, he just talked to Young and Eaton about the FCE and the job description in making the decision to place Mr. Gunter out of work. (Burns Dep. JA 74).

---

[10] Mr. Eaton's testimony conflicts with Ms. Young's testimony; she stated he was involved. (Young Dep. JA 38).

Ms. Young admitted that Bemis did not consider whether it would have been an undue hardship to continue to accommodate Mr. Gunter's temporary restriction involving overhead reaching. (Young Dep. JA 50-52). There was no discussion whether Mr. Gunter posed a threat to himself or others, the cost to the company, or the number of employees. (*Id.*).

**F.      Mr. Gunter is Terminated Because of His Disability and in Retaliation for Filing a Worker's Compensation Claim**

After the perfunctory meeting on July 18, 2014, Mr. Gunter was not allowed back to work. Former Plant Manager, Jimmy Smotherman stated that he was asked to sign Mr. Gunter's release papers, but refused to do so. (Smotherman Decl. JA Add. 370, ¶5). Mr. Smotherman was told that Mr. Gunter was no longer able to do his job because he was not fully released without restrictions, but he was aware Bemis did not want him to come back after he filed a worker's compensation claim and had surgery. (*Id.* ¶6, 9).

Mr. Gunter was terminated due to the FCE report that was requested for Mr. Gunter's worker's compensation case. (Burns Dep. JA 74-77; Young Dep. JA 35, 38, 43, 47-48). Bemis had a protocol that if an employee had a worker's compensation injury, a decision on continuation of employment would be made when the claim was settled. (Young Dep. JA 43; 7/24/14 Corr. Cole to Thomas JA 257). Indeed, Mr. Gunter was placed out of work ostensibly because Bemis was unable to accommodate him based on the FCE, but Bemis appeared to use this situation as leverage to "discuss settlement and separation of employment." (7/24/14 Corr. Cole to Thomas JA 257). However, after refusing to allow Mr. Gunter to return, refusing a reasonable accommodation, being left in limbo since July and unable to collect unemployment compensation; Mr. Gunter's attorney requested his termination paperwork. Bemis had been refusing to provide his termination papers since it wanted to only discuss termination in

conjunction with settlement of his worker's compensation claim. (Gunter Dep. JA 25-26; 10/15/14 Corr. Thomas to Cole JA 214-215). Mr. Gunter stopped receiving pay in August 2014. (Gunter Dep. JA 28). Ms. Young stated Mr. Gunter was not eligible for rehire for any position "because he has permanent restrictions." (Young Dep. JA 42).

## II.      SUMMARY JUDGMENT STANDARD

Under Rule 56, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150-151 (2000). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.*, 530 U.S. 133, 150-51. "The evidence of the nonmovant is to be believed." *Anderson v. Liberty Lobby, Inc.,* 477 U. S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Summary judgment should not be imposed to deny a party an opportunity to present a meritorious claim or defense on his/her "day in court." *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979).  In reversing a dismissal on a motion for summary judgment, the Supreme Court reiterated:

> The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system. By weighing the evidence and reaching factual inferences contrary to [plaintiff's] competent evidence, the [trial] court … neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.

*Tolan v. Cotton*, 134 S.Ct. 1861, 1868, 188 L.Ed. 2d 895, 897, 2014 LEXIS 3112 (May 4, 2014).

*See Harris v. JB Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010) (Testimony alone can be sufficient to create a jury question regarding an issue of material fact); *Walker v. Davis*, 649 F.3d

502, 505 (6th Cir. 2011) ("At the summary judgment stage, the relevant facts are the plaintiff's version of the facts . . . .").

## III. ARGUMENT

Bemis wanted to close out Mr. Gunter's worker's compensation claim. In doing so, it made the discriminatory decision to remove him his job that he had been successfully performing before it got the results of the FCE. Bemis ignored the realities of the workplace and testimony of its own supervisors, when it relied exclusively on the FCE which took into consideration only "approximations" and estimates in its written job description. A reasonable jury could conclude that its "good faith" meeting was anything but that, rather, it was a sham to support its pre-determined conclusion that it could not and would not accommodate Mr. Gunter's shoulder injury even though it had done so without undue hardship for months and Mr. Gunter had continued to successfully perform his job.

**A. A Reasonable Jury Could Find Bemis Violated the ADA and TDA Because They Admitted Their Perception of Mr. Gunter's Healing Shoulder As "Permanent Restrictions" Caused the Loss of His Job.**

Under the ADA, no covered entity shall discriminate against a qualified individual with a disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a). Impermissible discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* § 12112(b)(5)(A). "The term 'qualified individual'

means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8).

Discrimination in violation the ADA based upon circumstantial evidence uses the *prima facie* case and burden shifting method articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973), and later refined in *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982-83 (6th Cir. 2011). A *prima facie* case under the ADA requires a plaintiff to establish that (1) he is a disabled person within the meaning of the ADA, (2) he is qualified, that is, with or without reasonable accommodation which he must describe, he is able to perform the essential functions of the job, and (3) the employer took adverse action because of his disability. *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) (citing *White v. York Int'l Corp.*, 45 F.3d 357, 360-61 (10th Cir. 1995)). "The burden of establishing a prima facie case is not onerous, but one easily met." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, (1981); *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000); *EEOC v. Avery Dennison Corp.,* 104 F.3d 858, 861 (6th Cir. 1997); *Bryson v. Regis Corp.,* 498 F.3d 561, 570 (6th Cir. 2007); *Dixon v. Gonzales,* 481 F.3d 324, 333 (6th Cir. 2007) ("The burden of proof at the prima facie stage is minimal . . . ."). *Accord Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512, (2002) ("the precise requirements of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic'").[11]

---

[11] The TDA prohibits private employers from discriminating against employees "based solely on any physical, mental, or visual handicap of the applicant, unless such handicap to some degree prevents the applicant from performing the duties required by the employment or impairs the performance of the work involved." Tenn. Code Ann. § 8-50-103(a). A claim brought under the TDA is analyzed under the same principles as those utilized for the ADA. *Cardenas-Meade v. Pfizer, Inc.*, 510 F. App'x 367, 369 n.2 (6th Cir. 2013) (citing *Sasser v. Quebecor Printing (USA) Corp.*, 159 S.W.3d 579, 584 (Tenn. Ct. App. 2004)); *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 553 n.5 (6th Cir. 2008) ("Both federal and Tennessee disability discrimination actions require the same analysis."). However, the TDA does not include a 'reasonable accommodation' component." *Bennett v. Nissan N. Am., Inc.*, 315 S.W.3d 832, 841-842 (Tenn. Ct. App. 2009).

### 1. The Evidence and Testimony of Bemis's HR Manager and His Supervisors Demonstrate Mr. Gunter was Qualified to Perform the Essential Functions of His Job

The Sixth Circuit has acknowledged that "[t]he inquiry into whether a function is essential is highly fact specific." *Hoskins v. Oakland Co. Sheriff's Dep't*, 227 F.3d 719, 726 (6th Cir. 2000) (citing *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 849 (1998)). Whether a job function is essential "is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Rorrer v. City of Stow,* 743 F.3d 1025, 1039 (6th Cir. 2014) *(citing Keith v. Cnty. of Oakland,* 703 F.3d 918, 926 (6th Cir. 2013)). The employer's judgment will not be dispositive on whether a function is essential at the summary judgment stage when evidence on the issue is "mixed." [12] *Rorrer,* 743 F.3d at 1039 (citing *Feldman v. Olin Corp.,* 692 F.3d 748, 755 (7th Cir. 2012)).

The testimony of Bemis HR Manager (which Bemis tellingly omitted from its MSJ), Mr. Gunter's supervisor Jennings (which Bemis also omitted entirely) and his job description support that many functions were either marginal or less stringent than Bemis argues. Ms. Young admitted Mr. Gunter had been able to perform the essential functions of his job to be returned to his position following surgery: "[u]p until the time he actually got the no overhead work and **he could perform the essential functions of his job**, then he was put on overtime." (Young Dep. JA Add. 281). Likewise, in going through the job duties and description, Mr. Jennings testified that because the positions use various assistive tools like platform ladders, hoists and lifts, the work was limited to "guiding" which his "little niece could do," and at most, lifting a "little five

---

[12]The ADA regulations set forth in 29 C.F.R. § 1630.2(n)(3) enumerate several factors that courts may consider in determining if a function is essential. Those factors include: "(1) an employer's judgment that the function is essential; (2) written job descriptions; (3) the amount of time on the job devoted to performing the function; (4) the consequences of not requiring the employee to perform the function; (5) terms in a relevant labor agreement; (6) the work experience of those who have held the position in the past; and (7) the current work experience of those who hold similar jobs." 29 C.F.R. § 1630.2(n)(3).

gallon bucket" which weighed about twenty pounds. (Jennings Dep. JA Add. 264-266, 268-270, 272). *Rorrer,* 743 F.3d at 1040 (testimony from plaintiff's supervisor that a job function is marginal may rebut a job description that states a function is essential). Moreover, Bemis' exclusive reliance on the FCE and job description testimony is likewise misplaced because it conflicts with Supervisor Jennings' testimony which demonstrates an issue of fact for the jury. (ECF No. 37 p. 4-5, 24. *Supra* p. 5-6). Further, the photographic evidence Bemis relies on likewise conflicts with the testimony of Mr. Gunter, Mr. Bills, Mr. Jennings, and Mr. Moulder; in addition to the fact that these pictures were not relied on for purposes of Mr. Gunter's FCE or refusal to accommodate.[13] (*Supra* 3-6; Moulder 30(b)(6) Dep. JA 85-86).

Even the job description lists only standing and walking as "regularly required" tasks. (*Id.* JA 62). The "reasonable approximations" for the "occasional" tasks of carrying, lifting, pushing or pulling are estimated to take 20% of time on the task, and reaching is the only one listed as taking 50% of time. (*Id.*). *Rorrer,* 743 F.3d at 1039 (job descriptions are not dispositive whether it is essential). A reasonable jury could easily conclude that "occasional" tasks that were performed an estimated 20% of the time were in fact marginal functions that could be accommodated. Co-worker Bills, Supervisor Jennings and HR Manager Young admitted that there was not a lot of overhead work; reaching was limited and could be done with one hand. (Bills Dep. JA Add. 284; Jennings Dep. JA Add. 270; Young Dep. JA 36).

However, most telling are the across the board admissions that there were no problems with Mr. Gunter's job performance after he was released back to his PA position where he

---

[13] The descriptions at the top of the pictures are hearsay because that information was created for purposes of this litigation and the information was not verified. (Moulder 30(b)(6) Dep. JA 85-86, 90). Fed. R. Evid. 801, 802. *See,* e.g., *Armstrong v. Meijer, Inc.*, 40 F.Supp.2d 923, 924 (S.D.Ohio 1998), aff'd, 202 F.3d 267 (6th Cir. 1999) (notes taken by an employee investigating complaints in the regular course of her or his business activity are admissible as business records but any statements made by witnesses contained in the notes are inadmissible for the truth of the matter asserted).

worked for approximately eight months before he was required to take the FCE and then terminated.[14] (Moulder Dep. JA 79, 82, JA Add. 275; Jennings Dep. JA Add. 266-268. *See* Bills Dep. JA 104; Young Dep. JA 36, 40, 41, JA Add. 281; Burns Dep. JA 75, 76; Eaton Dep. JA 69-70). This case is analogous to *Camp v. Bi-Lo*, where employee Camp suffered from a disability that he had worked with throughout his employment as a stock clerk for 38 years. *Camp v. Bi-Lo, LLC*, 2016 U.S. App. LEXIS 19053 *2-3 (6th Cir. Oct. 21, 2016). The Store Director was not aware that Camp suffered from a disability that limited his lifting ability, but his direct supervisor was aware. *Id*. After an incident where Mr. Camp's shift crew failed to finish on time, the Director became aware of Mr. Camp's disability. *Id*. Immediately after that incident, HR called in Mr. Camp to ask if he could still perform his duties. Mr. Camp told HR "Yes, I can still do everything. I know what I can lift and what I can't, and I can do all the other things except lift the real super heavy items." *Id*. *3. At this point, Mr. Camp was given his job description which listed lifting capabilities up to 60 pounds and told him to have a physician review his physical capabilities. *Id*. *4. The physician capped Mr. Camp's lifting capabilities at 35 pounds. *Id*. At this time, Bi-Lo forced Mr. Camp on a leave of absence and ultimately terminated him for "job abandonment" because he was not cleared to return to lift 60 pounds. *Id*. *4-5. The Sixth Circuit reversed the trial court's dismissal of Camp's case on summary judgment holding that a jury must decide whether the ability to lift more than 35 pounds was an "essential function" of his grocery store clerk job in part because "blind deference is not accorded to employer's stated judgment" when an employee fulfilled job duties for years with the help of co-workers. *Id*. *16. Likewise, even though Bemis seeks to rely on its job description, the testimony contradicts

---

[14] Defendant's entire argument relies on the FCE. The problem with such reliance is that the FCE is hearsay. Fed. R. Evid. 801(c). *Wiley v. U.S.*, 20 F.3d 222, 226 (6th Cir. 1994)("[H]earsay evidence cannot be considered on a motion for summary judgment."). *See Coffman v. Robert J. Young Co.*, 871 F.Supp. 2d 703, 717 (M.D. Tenn. 2012) (medical records relied on by defendant to justify refusal to accommodate were being offered for the truth of the matter asserted and therefore were inadmissible hearsay because the records were not properly authenticated).

whether certain functions are indeed essential, particularly given the "requirement" that all employees are to help each other out. (Jennings Dep. JA Add. 270; Moulder Dep. JA 80; Bills Dep. JA 103, JA Add. 283)

### 2. Bemis Refused to Accommodate Mr. Gunter in Violation of the ADA

Bemis could have easily continued to accommodate the minor restrictions requested by Mr. Gunter's physician rather than illegally determining he was unable to perform his job duties after the FCE. The ADA imposes upon employers the duty to make reasonable accommodations for known disabilities unless doing so would result in an undue hardship to the employer. 42 U.S.C. § 12112(b)(5)(A). In order to establish a *prima facie* case for failure to accommodate, a plaintiff must show that: "(1) he is disabled within the meaning of the Act; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) his employer knew or had reason to know about his disability; (4) he requested an accommodation; and (5) the employer failed to provide the necessary accommodation." *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982-83 (6th Cir. 2011). The ADA does not require an employee to use "magic words" like "accommodation" or even "disability" in order to fulfill his duty to request an accommodation. *Id.* at 449.

The ADA also "mandates an individualized inquiry in determining whether an [employee's] disability . . . disqualifies him from a particular position." *Keith v. Cnty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013). The individualized inquiry is an "interactive process" in which "both parties have a duty to participate in good faith." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007). The purpose is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* (citing 29 C.F.R. § 1630.2(o)(3)). The law places a significant burden on

employers to accommodate an employee's injuries. *See, e.g., Keith*, 703 F.3d at 926-27. "Shifting marginal duties to other employees who can easily perform them is a reasonable accommodation." *Rorrer,* 743 F.3d at 1044; *see also* 29 C.F.R. §§ 1630.2(n)(1), (3). A policy that requires an employee to be 100% or have a full medical release can lead a jury to conclude a violation of the ADA has occurred and thus, is sufficient to defeat a motion for summary judgment. *Watts v. UPS*, 378 Fed. Appx. 520, 530 (6th Cir. 2010) (internal citations omitted).

Mr. Gunter was qualified for his position, he performed the job successfully for months before the FCE that he was forced to undergo. (Moulder Dep. JA 79, 82, JA Add. 275; Jennings Dep. JA Add. 266-268. *See* Bills Dep. JA 104; Young Dep. JA 36, 40, 41, JA Add. 281; Burns Dep. JA 75, 76; Eaton Dep. JA 69-70). *Camp v. Bi-Lo, LLC*, 2016 U.S. App. LEXIS 19053 *17 (successful performance under an informal arrangement should be considered "in a positive light"). Thus, Bemis' argument that Mr. Gunter is not otherwise qualified is unavailing. (ECF 37 p. 26).

Mr. Gunter suggested accommodations: he suggested other jobs, to continue in his job that he had been successfully working for eight months, or to be re-evaluated in a year. (Gunter Dep. JA 23- 26, 28, 30, JA Add. 292). Only by taking out of context Mr. Gunter's testimony does Bemis conclude he could be not accommodated. (ECF 37 p. 26). In Mr. Gunter's EEOC charge, he explained that "I thought when he referred to accommodate, that he meant change the configuration of the press." (EEOC Charge JA 210). Consistent with his testimony, when asked by Eaton how they could accommodate him on the back of the press, Mr. Gunter told Eaton that "you can't change the back of press, you know, from my arm going up" but that "I learned to work around it…because I tilt the bucket with his right hand and hold it with my left." (Gunter Dep. JA 23, JA Add. 295). Moreover, it is important to keep in mind that Bemis did not explain

what an accommodation was, he was not provided their ADA policy (because they did not have one), nor was an explanation read to him. (Gunter Dep. JA 23, 26; Eaton Dep. JA 70-71; Young Dep. JA 50). Mr. Gunter, who has limited reading and writing skills, has no knowledge of the ADA. (Gunter Dep. JA 24, 31). Furthermore, even Ms. Young acknowledged that Mr. Gunter did suggest accommodations. (Young Dep. JA 40, 42).

Bemis knew of Mr. Gunter's disability, it drew the conclusion he was unable to perform his job and it failed to provide a reasonable accommodation which it easily could have done given the team nature of the press jobs. (Jennings Dep. JA Add. 270; Moulder Dep. JA 79, 80; see Gunter Dep. JA 8). Bemis' argument that courts (none of which are in the Sixth Circuit) have rejected the "notion an employer should simply ignore permanent restrictions" is misplaced. (ECF 37 p. 20-21). All of the cases cited pre-date the amendments to the ADA and thus, are largely inapposite. (*Id*.). *See Dave v. Lanier*, 606 F. Supp. 2d 45, 49 (D.D.C. 2009) (ADAAA raises "serious questions as to the continued viability" of some earlier cases). Further, it ignores the significant burden on employers to accommodate an employee's injuries. *Rorrer,* 743 F.3d at 1044. S*ee, e.g., Keith*, 703 F.3d at 926-927. In *Rorrer*, the Sixth Circuit reversed dismissal on summary judgment in a case where a firefighter requested an accommodation to not drive a fire apparatus during an emergency due to his disability. *Rorrer,* 743 F.3d at 1044. In reversing the decision of the trial court, the court held that to make a determination an accommodation was not reasonable without considering whether a function was marginal and could "easily" have been performed by colleagues was error. *Id*. Similarly, in this case there was no discussion regarding what functions were marginal or if they could be modified or performed by others. Instead, there

was a myopic focus on Mr. Gunter's FCE and the job description rather than on the realities of the job.

A reasonable jury could find that consistent with the ADA's broad application, Bemis could have continued to accommodate Mr. Gunter's overhead restriction if it had focused its inquiry on which job functions were essential and whether they could be accommodated rather than simply deem his restrictions "permanent" (even though the FCE drew no such conclusion) and place him out of work. Moreover, Ms. Young's telling testimony that Bemis did not consider whether Mr. Gunter's request to continue working would have been an undue hardship, further demonstrates that Bemis' characterization of Mr. Gunter's FCE report as a "permanent restriction" is nothing more than a red herring. (Young Dep. JA 50-52). To be sure, none of Mr. Gunter's treating physicians made such a characterization.

Accordingly, drawing all inferences in Mr. Gunter's favor, Bemis failed to demonstrate as a matter of law that Mr. Gunter's requests for accommodation was unreasonable.

### 3. Bemis' July 18, 2014 Meeting Is Suggestive of Bad Faith Because Bemis Had a Predetermined Conclusion that Mr. Gunter Could Not Be Accommodated.

Once an accommodation has been requested, the employer has a duty to engage in an "informal, interactive process" with the employee to identify limitations of the disability and potential reasonable accommodations that could overcome those limitations. 29 C.F.R. §1630.2(o)(3). In *Rorrer*, the Sixth Circuit determined that an employer's immediate conclusion that an employee was unfit to serve suggested bad faith and fell short of its obligations under the ADA to find an accommodation. *Rorrer,* 743 F.3d at 1045. In doing so, the court looked at the fact that the decision maker failed to inquire of co-workers about the specifics of employee job duties, opting for a predetermined conclusion that accommodation was not feasible. *Id*. Refusal

to discuss reassignment is also suggestive of bad faith. *Id*. 1045-1046. Further, even if management explored reassignment but dismissed it because of a preconceived notion regarding what the essential functions of the position are, there is an indication that the employer lacked good faith. *Id*.

Bemis, like the City of Stow, arrived at a predetermined conclusion based on the FCE. (Young Dep. JA 38; Young Dep. Ex. 2 JA Add. 302). *Rorrer,* 743 F.3d at 1045. Indeed, Mr. Gunter did not ask to be placed out of work, instead he came to work every day and performed his job duties without complaint and met the expectations of his co-workers and supervisors. (Young Dep. JA 40-41, 51; Eaton Dep. JA 68-71; Moulder Dep. JA79, 82; Burns Dep. JA 74-75; Jennings Dep. JA Add. 267-268). The decision to place Mr. Gunter out of work was made between management before they discussed the FCE with Mr. Gunter. (Eaton Dep. JA 68; Young Dep. JA 38). As such, a reasonable jury could find that Bemis' immediate displacement of Mr. Gunter from his job and removal from the position that he had been successfully performing was indicative of bad faith and contrary to the requirements of the ADA.

### B. A Reasonable Jury Could Find Bemis Retaliated Against Mr. Gunter In Violation of the ADA and Tennessee Common Law Because He Requested Accommodations and Filed a Worker's Compensation Claim.

#### 1. Bemis Retaliated Against Mr. Gunter in violation of the ADA

The ADA bars discrimination that is a "but-for" cause of the employer's adverse action. *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc). The Sixth Circuit has determined that because the ADA prohibits discrimination due to a disability and the ADA defines discrimination to include failing to provide a reasonable accommodation, then "claims premised on an employer's failure to offer reasonable accommodation necessarily involve direct evidence." *Kleiber*, 485 F.3d at 868 (applying the direct evidence standard for a

failure to accommodate claim). Temporal proximity to protected conduct and an adverse employment action can establish causation. *Bryson v. Regis Corp.,* 498 F.3d 561, 571 (6th Cir. 2007). "Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004) (citations omitted). The Sixth Circuit has described direct evidence as that which "*requires* the conclusion" that unlawful [discrimination] was a factor in the employer's action. *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2007) (emphasis in original). Direct evidence includes "evidence that the employer relied on the plaintiff's disability in making its employment decision." *Monette*, 90 F.3d at 1178. It is unlawful for an employer to require a medical examination or make inquiries as to the nature or severity of a disability unless it is job related and consistent with business necessity. 29 C.F.R. §1630.13(b), 29 C.F.R. 1630.14(c).

Mr. Gunter engaged in protected conduct by requesting an accommodation when he submitted multiple notes requesting accommodations for restrictions related to his workplace injury from late 2013 to mid-2014. (Young Dep. Ex. 2 JA Add. 300-303, Young Dep. Ex. 7 JA Add. 296). These requests for accommodation ultimately caused Mr. Gunter's termination because Bemis admitted it would not accommodate him despite his successful job performance. Mr. Gunter was put out of work the day Bemis received the FCE and told they could not accommodate him when they did meet him. (Young Dep. JA 38; Eaton Dep. JA 68). *Monette*, 90 F.3d at 1178. Accordingly, Mr. Gunter has demonstrated that a reasonable fact finder could likewise determine he was terminated in retaliation for exercising his rights under the ADA by requesting an accommodation.

### 2. Bemis Retaliated Against Mr. Gunter in violation of Tennessee Common Law Because He Filed a Worker's Compensation Claim

Mr. Gunter is able to demonstrate causation based on statements made by Bemis

employees that he was terminated as a result of the FCE that was required for his worker's compensation case. To demonstrate a claim for retaliatory discharge, a reasonable jury could find facts that support: (1) The plaintiff was an employee of the defendant at the time of the injury; (2) the plaintiff made a claim against the defendant for workers' compensation benefits; (3) the defendant terminated the plaintiff's employment; and (4) the claim for workers' compensation benefits was a substantial factor in the employer's motivation to terminate the employee's employment. *Anderson v. Standard Register Co*., 857 S.W.2d 555, 558 (Tenn. 1993).

Causation is demonstrated by several facts in this case. Mr. Gunter was put out of work and terminated after he cooperated with the FCE that was required to close out his worker's compensation claim. (Young Dep. JA 36-37). Mr. Smotherman testified he was told that Mr. Gunter was no longer able to do his job because he was not fully released without restrictions, and he was made aware Bemis did not want Mr. Gunter to come back and have benefits after he filed a worker's compensation claim and had surgery. (Smotherman Decl. JA Add.370 ¶6, 9). Bemis's protocol that a decision on continuation of employment would be made when an employee's worker's compensation claim was settled is suggestive that refusal to settle a claim could result in termination. (Young Dep. JA 43). Finally, Ms. Young urged Mr. Gunter several times to drop his worker's compensation claim or he would lose his job. (Gunter Dep. JA 24, JA Add. 286). Accordingly, Mr. Gunter has demonstrated evidence that a reasonable fact finder could determine he was terminated in retaliation for filing a worker's compensation claim.

## IV. CONCLUSION

For the foregoing reasons, Mr. Gunter respectfully requests that the Court DENY Defendant's motion for summary judgment.

Respectfully submitted,

*/s Heather Moore Collins*
Heather Moore Collins BPR # 026099
Anne Hunter Williams BPR # 022407
Collins & Hunter PLLC
7000 Executive Center Drive, Suite 320
Brentwood, TN 37027
615-724-1996
615-691-7019 FAX
heather@collinshunter.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY certify that a copy of the foregoing has been emailed through the court's CM/ECF system this 1st day of February, 2017 by electronic mail to counsel of record: Jonathan O. Harris, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., SunTrust Plaza, Suite 1200, 401 Commerce Street, Nashville, Tennessee 37219.

   */s/ Heather Moore Collins*
Heather Moore Collins